IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| HA-LO INDUSTRIES, INC., | ) |
| Plaintiff, | ) ) ) |
| | ) No. 04 C 3163 |
| v. | ) ) Judge Robert W. Gettleman |
| CREDIT SUISSE FIRST BOSTON, CORP., | ) ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff HA-LO Industries, Inc. has sued defendant Credit Suisse First Boston Corp. for gross negligence and negligent misrepresentation (Count I), breach of contract (Count II), and breach of fiduciary duty (Count III), relating to the services defendant provided to plaintiff in connection with a merger between plaintiff and Starbelly.com, Inc. ("Starbelly"). Defendant has moved for summary judgment on all three counts. For the reasons set forth below, the motion is denied.

## FACTS

Lewis Weisbach started plaintiff as a small promotional products company to support his income as a school teacher. He was successful and began to buy up other small promotional product companies, eventually turning plaintiff into the largest promotional products company in the United States. Plaintiff went public in 1992, was listed on the New York Stock Exchange, and by the end of 1999 had more than $600 million in annual sales. In 1999, however, the tide began to turn and plaintiff's net income began to decline. It had cash flow problems, aging accounts receivables, and duplicate warehouses and other resources. Plaintiff's stock price declined from $25.54 per share on January 4, 1999, to $4.63 per share on October 13, 1999.

To counter these problems, sometime in late 1999 or 2000 plaintiff's board of directors decided to transform plaintiff by developing or acquiring an internet-based sales and distribution system for its promotional products business. John Kelley replaced Weisbach as CEO and president. In late summer or early fall 1999, plaintiff's vice chairman introduced Kelley to Brad Keywell and Eric Lefkofsky, the founders of Starbelly, an internet-start-up company that was developing the kind of system Kelley wanted. Kelley began negotiating to acquire Starbelly. By December 18, 1999, plaintiff and Starbelly had entered a non-binding term sheet providing for a purchase price of $240 million; $70 to $100 million to be paid in cash and the remainder to be paid in common stock of plaintiff.

Due to the size of the transaction, plaintiff retained defendant to advise plaintiff with respect to its potential acquisition of Starbelly. Plaintiff and defendant entered into an engagement agreement ("engagement letter") on December 6, 1999, under which defendant agreed to act as plaintiff's "exclusive financial advisor in connection with a possible acquisition of/proposed merger or other business/strategic combination" with Starbelly. Although the parties dispute the parameters of defendant's role under the agreement, the engagement letter specifically provides that defendant shall, as appropriate:

> (a) advise and assist [plaintiff] with respect to defining objectives, performing evaluation analysis and structuring and planning the Transaction;
>
> (b) advise and assist [plaintiff] negotiating the terms and conditions of the Transaction;
>
> (c) advise [plaintiff] with respect to alternatives to the Transaction;
>
> (d) upon request, render an opinion as to the fairness from a financial point of view of the consideration to be paid by [plaintiff] pursuant to the Transaction;

(e) advise and assist in the preparation of proxy or information statement materials pertaining to the transaction, including, without limitation, the preparation of summaries of the negotiation history of the [defendant's] opinion to be included in such materials; and

(f) perform such other financial advisory services as [defendant] and the [plaintiff] may from time to time agree upon.

Defendant's fee under the agreement was dependent upon the purchase price paid by plaintiff for Starbelly. Defendant received a $100,000 non-refundable retainer, and a transaction fee calculated as the greater of $1,500,000 or a variable percentage of the purchase price. Thus, if plaintiff elected not to complete the deal, defendant would receive only the $100,000 plus 10% of any "break up" fee.

Because defendant had no expertise with respect to information technology systems and infrastructure technology, it recommended that plaintiff hire a third party consultant to evaluate Starbelly's technology. Consequently, plaintiff hired Ernst & Young, which reported that Starbelly's technology was incomplete, and that completion would require significant time and money. The parties dispute whether Ernst & Young's reports were ever provided to defendant.

Despite Ernst & Young's serious questions about Starbelly's technology, Kelley told plaintiff's board that Ernst & Young's assessment of the technology was positive. At a January 6, 2000, board meeting Kelley stated his belief that Starbelly represented the best option for the "e-transformation" of plaintiff's promotional products division. The board agreed and approved a $5 million loan to Starbelly. Defendant was not present at that meeting. Ten days later, on January 16, 2000, plaintiff's board held a special meeting to evaluate the proposed merger with Starbelly. At that meeting, defendant provided a written presentation that included defendant's analysis of plaintiff's liquidity. The merger was approved the following day. On

April 12, 2000, plaintiff issued a proxy statement, a portion of which was reviewed by defendant, in which the board unanimously recommended that the stockholders approved the transaction. The transaction was approved by the stockholders on May 3, 2000. Defendant received a total fee of $2.6 million.

After the transaction closed, plaintiff tried to integrate Starbelly and to complete development of Starbelly's technology. Despite substantial time and tens of millions of dollars, the technology was never completed. Plaintiff's business declined and plaintiff began to lose money. On July 30, 2001, less than two years after the merger, plaintiff filed a voluntary petition for relief under Chapter 11 of the bankruptcy laws.

## DISCUSSION

As an initial matter, the court must determine what law governs each of plaintiff's claims. The engagement letter provides that "[a]ll aspects of the relationship created by this agreement shall be governed by and construed in accordance with the laws of the state of New York applicable to contracts made and to be performed therein. Each of [plaintiff and defendant] waives all right to trial by jury in any action, suit, proceeding or counterclaim (whether based upon contract, tort or otherwise) related to or arising out of the engagement of [defendant] pursuant to, or the performance by [defendant] of the services contemplated by this agreement." Defendant argues that all of plaintiff's claims, whether sounding in contract or tort, are governed by New York law. Plaintiff agrees that New York law governs its contract claim, but "does not concede that New York law governs [plaintiff's] remaining claims . . .." Plaintiff then states that it relies primarily on New York case law because it should prevail under either state's law.

The court construes plaintiff's statement as a tacit admission that New York law governs all of its claims. In any event, the court agrees with defendant that all of plaintiff's claims arise out of its relationship with defendant that was created by the agreement. Accordingly, the court will apply New York law to all of the claims.

Count I

In Count I plaintiff alleges that defendant was grossly negligent and/or acted in bad faith when rendering its opinion on the acquisition. In particular, plaintiff alleges that defendant: (1) valued Starbelly using a methodology that defendant knew or should have known would overstate the value; (2) disregarded relevant information about the value of Starbelly's technology assets; (3) disregarded public information about the business practices of Starbelly's management team; (4) advised plaintiff that defendant's valuation of Starbelly was correct despite the collapse in the e-commerce market; (5) omitted relevant information about the "limitations" in its fairness opinion from the language it approved for the proxy statement; and (6) permitted its own interest in securing a lucrative fee and anticipating future business to override its exercise of reasonable judgment in performing its obligations.

Defendant has moved for summary judgment on Count I, raising three separate arguments: (1) New York does not recognize a claim for negligent performance of a contract; (2) economic loss is not recoverable under a theory of negligence; and (3) defendant made no misrepresentation of fact. The court rejects all three arguments.

First, with respect to a claim for negligent performance of a contract under New York law, defendant is simply wrong when it argues that the cause of action does not exist. Although the law in New York on this subject is somewhat confusing, it is well settled that negligent

performance of a contract may give rise to a claim sounding in tort as well as for one for breach of contract, at least in certain circumstances. William Wrigley, Jr. Co. v. Waters, 890 F.2d 594, 602 (2d Cir. 1989). In New York there are two distinct lines of cases addressing the issue, neither of which has been overruled, but both of which recognize the cause of action. The first, typified by Wrigley, recognizes a cause of action for negligent performance of a service contract. Id. The second, typified by Clark-Fitzpatrick, Inc. v. Long Island R. Co., 521 N.Y.S. 2d 653, 657 (1987), takes a slightly narrower view, holding that a negligence claim exists when "a legal duty independent of the contract itself has been violated." As plaintiff notes, although they articulate the standard differently, there is no real substantive difference between the two theories. In Wrigley, 890 F.2d at 602, the court stated that:

> Where a person contracts to do certain work he is charged with the common law duty of exercising reasonable care and skill in the performance of the work required to be done by the contract. It is the breach of the duty imposed by law and not of the contract obligation which constitutes the tort.

Thus, even under Wrigley, the asserted breach was of a duty independent of the contract itself. The defendants had held themselves out as experts in trademark law and were required to act with the care and caution proper to their calling. Id. In the instant case, plaintiff alleges that defendant held itself out as an expert in the business of providing financial advisory service and as such must perform with the care and caution proper to such experts. Plaintiff alleges that defendant violated that duty in a grossly negligent manner. That cause of action exists under either line of cases.

Moreover, the economic loss doctrine does not apply to a claim for negligent performance of contractual services. Amer. Tel. and Telegraph Co. v. New York City Human Resources

Administration, 833 F. Supp. 962, 983 (S.D.N.Y. 1993); Ajax Hardwood Mfg. Corp. v. Indus. Plants Corp., 569 F.2d 181, 185 (2d Cir. 1977).

Finally, defendant's argument that it committed no grossly negligent misrepresentation cannot be decided on summary judgment. Plaintiff argues that defendant's statement that $240 million was within the reasonable range of value for Starbelly when in fact it should have known that Starbelly was worth nothing close to that figure was a grossly negligent misrepresentation. Plaintiff relied on that statement in the preparation of the proxy statement, which defendant then edited. Whether defendant was in fact grossly negligent, whether plaintiff's reliance was reasonable, and whether plaintiff was injured as the result, are disputed factual questions to be decided at trial, not on summary judgment. Fed. R. Civ. P. 56. Accordingly, defendant's motion for summary judgment on Count I is denied.

Count II

In Count II plaintiff alleges that defendant breached its contractual obligations to: (1) provide an honest opinion of the fairness of the Starbelly purchase price from a financial point of view; (2) assist plaintiff in performing an accurate valuation of Starbelly; and (3) offer good faith advice as to the terms of the Starbelly transaction. Defendant has moved for summary judgment, arguing that the undisputed facts demonstrate that defendant did not breach the terms of the engagement letter and that plaintiff suffered no damage from the breach it alleges.

It is unquestioned that defendant acted as plaintiff's financial advisor for the transaction in question and did in fact provide plaintiff with a written fairness opinion. The engagement letter provides that defendant will not be liable to plaintiff for anything "related to or arising out of the engagement or [defendant's] performance thereof" except for "[l]osses that are finally

7

determined by a court or arbitral tribunal to have resulted primarily from the bad faith or gross negligence" of defendant. Thus, the parties agree that whether defendant breached the contract depends on whether defendant performed in a grossly negligent manner or in bad faith.

Despite defendant's characterization of the transaction, there are few undisputed facts in the case. Defendant asserts that any errors in its valuation of Starbelly was the result of what it terms "simple mistakes." As plaintiff points out, however, given that the analyst who gathered the data asserted his Fifth Amendment right to avoid self incrimination rather than testify as to how those "simple mistakes" occurred, it would be inappropriate for this court to determine on summary judgment that defendant's conduct cannot, as a matter of law, amount to gross negligence.

Defendant also argues that even if it breached the contract, the breach did not cause plaintiff's damage. In essence, defendant argues that its alleged breach was not the primary cause of either the merger or plaintiff's bankruptcy. Specifically, defendant points to the fact that plaintiff argued before the bankruptcy court that Kelley concealed from plaintiff's board of directors Ernst & Young's conclusions about the cost to complete Starbelly's technology, and that had the board known that information it would have rejected the transaction regardless of defendant's fairness opinion. As plaintiff notes, however, there is evidence that but for defendant's valuation and fairness opinion, there might never have been a vote by the board. It is not the job of this court on summary judgment to determine which, of many factors, caused plaintiff's injury. This court cannot weigh the evidence on summary judgment. Payne v. Pauley, 337 F.3d 767, 770 (7th Cir. 2003). Accordingly, defendant's motion for summary judgment on Count II is denied.

Count III

Count III charges defendant with breach of a fiduciary obligation. Defendant has moved for summary judgment arguing that it does not owe plaintiff a fiduciary duty. In New York, "[a] fiduciary duty may be created by the express provisions of a contract, or by factors such as the length of the relationship of the parties, their financial interdependence, and their sharing of confidential and proprietary information . . .. However, not every commercial contract or relationship creates a fiduciary duty." ADT Operations v. Chase Manhattan Bank, N.A., 662 N.Y.S. 2d 190, 192 (Supp. Ct. 1997). In the instant case, the contract in question, the engagement letter, specifically disclaims such a duty by indicating that defendant "is acting as an independent contractor and not in any other capacity."

Plaintiff does not argue, however, that the contract alone created the alleged duty. Instead, plaintiff points to evidence tending to show a long term ongoing relationship between plaintiff and defendant, of which the Starbelly deal was but one part. There is evidence in the record to show that defendant possessed superior knowledge with respect to the valuation of internet companies, and methods for assessing liquidity. There is no question that plaintiff placed a certain amount of trust in defendant to advise it with respect to the transaction.

Whether a fiduciary duty arose out of the relationship between plaintiff and defendant is a question of fact that cannot be decided on summary judgment. See Niagra Mohawk Power Corp. v. Stone & Webster Engineering Corp., 1992 WL 121726 at *21 (N.D.N.Y. 1992); Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb Inc., 767 F. Supp. 1220, 1232-33 (S.D.N.Y. 1991). In the instance case, there is a significant difference between the parties' characterization of their relationship. Plaintiff points to the deposition testimony of Weisbach, who indicated that he

9

would only "go along with the deal" upon the recommendation of defendant because of his longstanding relationship with it. Defendant, on the other hand, points to evidence to demonstrate that plaintiff cannot show a high degree of dominance and reliance sufficient to impute a fiduciary duty. See Societe Nationale D'Exploitition Industrelle des Tabacs et Allumettes v. Salmon Brothers Int'l Ltd., 674 N.Y.S. 2d 648, 649 (App. Div. 1998). Once again, defendant essentially asks the court to weigh the evidence in the record in its favor. That is inappropriate on summary judgment. F. R. Civ. P. 56. Accordingly, defendant's motion for summary judgment on Count III is denied.

## CONCLUSION

For the reasons set forth above defendant's motion for summary judgment is denied. This matter is set for a report on status on November 9, 2005, at 9:00 a.m

**ENTER:** **October 12, 2005**

_____
Robert W. Gettleman
United States District Judge